CV-10 0064

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

TINO POSILLICO,

                                  Plaintiff,

          -against-

LORRAINE GREENWALD, EILEEN EICHLER,
MARJANEH ISSAPOUR, BARRY JOHN CAPELLA,
AGNES KALEMARIS, W. HUBERT KEEN, and
KEVIN ROONEY, individually and in the official
capacities and as aiders and abettors,

                               Defendants.

---------------------------------------------------------------X

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JAN 0 8 2010 ★

LONG ISLAND OFFICE

**COMPLAINT**

Jury Trial Demanded

**WEXLER, J.**

**TOMLINSON, M**

       Plaintiff, Tino Posillico, by his attorneys, Leeds Morelli & Brown, P.C., complaining of Defendants herein, alleges, upon knowledge as to himself and his own actions, and upon information and belief as to all other matters:

**JURISDICTION AND VENUE**

1.     This is a civil action based upon the 42 U.S.C. § 1983; New York State Executive Law § 296(6); common law breach of contract; and any other cause of action that can be inferred from the facts set forth herein.

2.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. §1343(3), 28 U.S.C. § 1343(4). The supplemental jurisdiction of the Court (28 U.S.C. § 1367) is invoked over state and local law causes of action.

3.     Venue is proper pursuant to 28 U.S.C. § 1391(b).

## PARTIES

4.     At all times relevant to this action, Plaintiff Tino Posillico was and still is a resident of Suffolk County, State of New York.   At all relevant times, Plaintiff was and is an employee of Farmingdale State.

5.     Defendant Lorraine Greenwald, at all relevant times, was the Acting Dean of the School of Business at Farmingdale State.  As such, Greenwald, at all relevant times, responsible for Farmingdale State's operation, including, but not limited to, the hiring, firing, promotion and discipline of employees and all other employment-related issues. Additionally, Greenwald was, at all relevant times, a policymaker charged with the responsibility of ensuring that employees are not subjected to discriminatory and/or retaliatory practices.  At all relevant times, Greenwald had the power to make or influence personnel decisions regarding Plaintiff's employment.

6.     Defendant Eileen Eichler, at all relevant times, was a faculty member at Farmingdale State and the former Dean of the School of Business at Farmingdale State.

7.     Defendant Marjaneh Issapour, at all relevant times, was a member of Farmingdale State's Committee for Continuing and Term Appointment and its campus-wide College Academic Faculty Promotions Committee.  As such,  Issapour was, at all relevant times, responsible for Farmingdale State's operation, including, but not limited to, the hiring,

2

firing, promotion and discipline of employees and all other employment-related issues.
Additionally, Issapour was, at all relevant times, a policymaker charged with the
responsibility of ensuring that employees are not subjected to discriminatory and/or
retaliatory practices. At all relevant times, Issapour had the power to make personnel
decisions regarding Plaintiff's employment.

8.      Defendant Barry John Capella, at all relevant times, was the Committee for Continuing
and Term Appointment ("CCTA") at Farmingdale State. As such, Capella was, at all
relevant times, responsible for Farmingdale State's operation, including, but not limited
to, the hiring, firing, promotion and discipline of employees and all other employment-
related issues. Additionally, Capella was, at all relevant times, a policymaker charged
with the responsibility of ensuring that employees are not subjected to discriminatory
and/or retaliatory practices. At all relevant times, Capella had the power to make
personnel decisions regarding Plaintiff's employment. In addition, Capella, at times
relevant to this action, a member of Farmingdale State's campus-wide College Academic
Faculty Promotions Committee.

9.      Defendant Agnes Kalemaris, in 2007/2008, 2008/09 and 2009/10, was the Chairperson of
the campus-wide College Academic Faculty Promotions Committee ("CAFPC") at
Farmingdale State. As such, Kalemaris was, at all relevant times, responsible for
Farmingdale State's operation, including, but not limited to, the promotion of employees
and all other employment-related issues. Additionally, Kalemaris was, at all relevant
times, a policymaker charged with the responsibility of ensuring that employees are not

3

subjected to discriminatory and/or retaliatory practices. At all relevant times, Kalemaris had the power to make personnel decisions regarding Plaintiff's promotion and advancement. In addition, Kalemaris was a member of said committee throughout Plaintiff's tenure at Farmingdale.

10.  Defendant W. Hubert Keen, at all relevant times, was the President of Farmingdale State. As such, Keen was, at all relevant times, responsible for Farmingdale State's operation, including, but not limited to, the hiring, firing, promotion and discipline of employees and all other employment-related issues. Additionally, Keen was, at all relevant times, a policymaker charged with the responsibility of ensuring that employees are not subjected to discriminatory and/or retaliatory practices. At all relevant times, Keen had the power to make personnel decisions regarding Plaintiff's employment.

11.  Defendant Kevin Rooney ("Rooney"), at all relevant times, was the Vice President of Farmingdale State. As such, Rooney was, at all relevant times, responsible for Farmingdale State's operation, including, but not limited to, the hiring, firing, promotion and discipline of employees and all other employment-related issues. Additionally, Rooney was, at all relevant times, a policymaker charged with the responsibility of ensuring that employees are not subjected to discriminatory and/or retaliatory practices. At all relevant times, Rooney had the power to make personnel decisions regarding Plaintiff's employment.

## FACTUAL BACKGROUND

12.     Plaintiff commenced his employment with the State University of New York at
        Farmingdale ("Farmingdale") in September 1999, as a visiting professor.

13.     In January 2000, Farmingdale appointed Plaintiff to a renewable, tenure-track, full-time
        professorship in the Computer Systems Department at Farmingdale State.

14.     In May 2000, Plaintiff started teaching at the CISCO Academy (an academic program
        supported by the company CISCO Systems) at Farmingdale.

15.     In Fall 2000, Plaintiff and Assistant Professor Lorraine Greenwald, Plaintiff's colleague,
        entered into a romantic relationship.

16.     In Spring 2001, Plaintiff was certified as a regional instructor for the CISCO Academy.

17.     In 2002, with the approval of Farmingdale State, Plaintiff formed the Institute for
        Networking Systems Technology and Education Programs ("INSTEP") and was
        appointed INSTEP'S director.   At the same time, Plaintiff continued to teach at the
        CISCO Academy.

18.     In late 2002 or early 2003, Plaintiff ended his romantic relationship with Greenwald,
        despite her stated and demonstrated desire to continue with the relationship.

19.   Between April 2003 and October 2003, Greenwald sent Plaintiff messages containing the phrase "come fetch me," which was the way she had previously signaled to Plaintiff that she wanted to see meet him for a romantic or sexual encounter.  Greenwald also gave Plaintiff personal gifts, including an engraved bracelet, teddy bear with heart, and silver-plated computer mouse.

20.   In Fall 2003, Greenwald was appointed as Chair of the Department of Computer Systems, making her Plaintiff's immediate supervisor.

21.   Shortly thereafter, Greenwald began to harass Plaintiff, in a seeming attempt to coerce him to continue their relationship and/or punish Plaintiff for failing to continue their relationship.

22.   Throughout the 2003/04 school year, Greenwald verbally harassed Plaintiff, including by calling him a "jerk," "retarded," and/or "stupid" in front of other faculty, staff, and students.

23.   Greenwald also took other actions to make Plaintiff's life more difficult because he had ended their relationship.  For example, Greenwald overfilled Plaintiff's classes with students.

24.     When Plaintiff complained to Eileen Eichler, Dean of the School of Business, about his classes being overfilled and the gender discrimination and sexual harassment by Greenwald, Eichler wrote him a counseling memorandum.

25.     On March 30, 2004, Plaintiff emailed Greenwald and asked that she stop her verbal abuse, which included her saying to him in public phrases such as "don't you get, I'm your boss now," "you have to do what I say," "you're really thick" "you're not going to be around," "whose the moron who would ever want to marry him." Greenwald had also been telling Plaintiff to keep his mouth closed and had been calling him "fucking jerk" and "asshole" in public.

26.     At the end of the 2003/04 school year, Greenwald wrote on Plaintiff's Faculty Annual Report[1], "I acknowledge the receipt of this report but cannot attest to the validity."

27.     On or about June 10, 2004, Eichler and Greenwald removed Plaintiff as the Director of INSTEP and replaced him with Marjaneh Issapour, a female who had not rejected Greenwald's romantic advances and/or for engaging in protected activities.

---

[1] Faculty Annual Reports are reports which faculty members generate to describe their teaching, extracurricular activities (such as workshops attended), and publications for the year. When a faculty member completes his or her report, he or she submits the report to his or her supervisor, who verify the content of the report. These reports must be included and/or referenced in the promotion applications.

28.    On or about September 1, 2004, Greenwald was promoted to the position of Associate Professor, but remained Plaintiff's supervisor.    Plaintiff, who had applied for that promotion, was summarily rejected for the position because Greenwald had influenced the decision-makers.

29.    On November 18, 2004, Plaintiff, despite discouragement by and obstruction from Eichler, filed an internal complaint of discrimination with Farmingdale's Office of Diversity and Affirmative Action.    That internal complaint, which Plaintiff amended on December 1, 2004, stated that Greenwald was harassing Plaintiff for having terminated their romantic relationship and for not acquiescing to her sexual advances.    Plaintiff also complained of discrimination and/or sexual harassment to Farmingdale State's then-President Jonathan Gibralter.

30.    In December 2004, Plaintiff told the entire Committee for Continuing and Term Appointment ("CCTA"), in person, that he had filed an internal complaint with the Farmingdale State's Office of Diversity and Affirmative Action.    Defendants Capella and Greenwald were members of that committee at that time.

31.    Also in December 2004, Plaintiff was denied tenure by the CCTA, of which Greenwald was then a member.

32.    In a letter dated December 23, 2004, Farmingdale State informed Plaintiff that his employment would not be renewed.

8

33.    In January 2005, Greenwald and her friend Issapour banned Plaintiff from teaching in INSTEP and the CISCO Academy despite his qualifications to teach there, positive student feedback, and assignment to teach there as a member of the Computer Systems Department.  As a result, Plaintiff lost additional pay he had been receiving from those teaching assignments.  To date, that ban remains in effect.

34.    In or around January 2005, Plaintiff and Farmingdale State agreed to settle Plaintiff's internal complaint of discrimination.  Pursuant to that agreement, Plaintiff was transferred to the Department of Criminal Justice in the School of Liberal Arts and Sciences, thereby taking him away from Greenwald's supervision.

35.    In March or April 2005, Plaintiff sent a letter to the entire College Academic Faculty Promotions Committee ("CAFPC"), of which Greenwald was a former member and Kalemaris and Issapour were current members.  Plaintiff specifically informed the CAFPC members that he had filed an internal complaint about discrimination.  The CAFPC then informed Plaintiff that he would not be allowed to participate in the promotion process.

36.    On April 7, 2005, Farmingdale State, Plaintiff, and Plaintiff's union (United University Professions) entered into a stipulation which memorialized the January 2005 agreement and was made effective retroactively to January 2005.  That stipulation stated, inter alia, that: (1) neither Eichler nor Greenwald could make oral or written recommendations for

the re-appointment review process regarding Plaintiff; (2) Greenwald could not participate in deliberations of the CCTA; (3) all documents written by Eichler or Greenwald between September 1, 2003 and April 7, 2005 would be permanently removed from Plaintiff's personnel file; and (4) all documents or material written by written by Eichler or Greenwald between September 1, 2003 and April 7, 2005 would not be submitted or considered relative to the re-appointment of Plaintiff.   Greenwald and Eichler were parties to this agreement.

37.     However, some or all of these terms were not followed.   For example, not all of documents were purged from Plaintiff's file and, as described below, Greenwald was allowed to give input into decisions made by the CCTA.

38.     In or around November 2005, Plaintiff re-applied for a promotion within his new department.     That application included recommendations from his new Department Chair and support from his new Dean.

39.     Plaintiff's new Departmental Committee on Promotion voted in favor of the promotion.

40.     The next level, the Unit Committee on Promotion, ranked Plaintiff in the highest position for promotion.   In November 2005, that committee referred the application to CAFPC, of which Greenwald had been a member.

10

41.     In Spring 2006, CCTA informed Plaintiff that it had denied his Plaintiff tenure. The decision indicated that Greenwald had evaluated Plaintiff for this tenure application and his further employment at Farmingdale State.

42.     However, in June 2006, President Jonathan Gibralter overrode the decision of the CCTA and granted Plaintiff tenure.

43.     Three members of the Greenwald-influenced CCTA, in July 2006, joined the CAFPC. Specifically, Judy Friedman, Defendant Capella, and Defendant Issapour joined that committee.

44.     In July 2006, the CAFPC ranked Plaintiff last among the promotion candidates.   That committee then passed the ranking list to Gilbralter for a final decision on promotion. Gibralter informed Plaintiff that Plaintiff needed to have more time in the Department of Criminal Justice, into which Plaintiff had been forced to transfer a year and a half prior because of the harassment by Greenwald.

45.     In August 2006, Eichler resigned her position as Dean of the School of Business.  As a result, Greenwald became the Acting Dean of the School of Business.

46.   In August or September 2006, Plaintiff discussed his requested promotion with the then-Provost W. Hubert Keen.   Plaintiff raised his prior complaint of discrimination and settlement to Keen, Keen refused to look at the documentation Plaintiff wanted to show him.

47.   In late November 2006 or early December 2006, Plaintiff spoke with Mike Smiles, Plaintiff's union representative, and asked him to speak with George La Rosa, who was Farmingdale's Acting President (after Gibralter and before Keen was officially promoted from Provost) about the promotion.   Plaintiff informed Smiles of the ongoing discrimination, sexual harassment, and retaliation, and Smiles and/or Plaintiff informed La Rosa of that discrimination, sexual harassment, and retaliation.   .   La Rosa offered a dry promotion for Plaintiff, meaning that Plaintiff would have an increase in title but not in pay.   However, La Rosa wanted to obtain permission from Keen.   Thereafter, Keen and La Rosa began passing the decision on the dry promotion between each other, and Plaintiff did not receive that promotion.   Beginning into the Fall 2006 and continuing into 2007, Plaintiff repeatedly called Keen to discuss the promotion, but Keen did not meet with Plaintiff.

48.   In January 2007, Keen and La Rosa stopped going back and forth, resulting in Plaintiff's being denied even the dry promotion.

49.   In June or July 2007, Plaintiff applied for a promotion through the administrative channel, meaning directly to the then-President W. Hubert Keen, a route which had been

successfully used by other faculty members in the past.  Plaintiff also informed Keen of the sexual harassment, discrimination, and retaliation at that point..  Keen rejected Plaintiff's promotion application and told Plaintiff to apply through traditional channels (namely, the three levels of committees).  However, at this point, it was too late for Plaintiff to apply for a promotion through the traditional channels, as he would have had to submit his application by October 2006.

50.    In August 2007, Plaintiff filed a Charge of Discrimination with the EEOC. ("EEOC Charge")

51.    In or about September 2007, Plaintiff re-applied for a promotion.  Eichler spoke with CAFPC members before the committee met and that committee gave Plaintiff's promotion application a low ranking and non-recommended promotion for Plaintiff.  Kalemaris, Issapour, and Capella were all members of the CAFPC at the time.

52.    Keen then denied Plaintiff a promotion, despite his ability to decide independently from the determination of the CAFPC.  Plaintiff was the only employee denied a promotion by the CAFPC during that cycle.

53.    In November 2007, Plaintiff amended his EEOC Charge.  Defendants informed Keen, Rooney, Eichler, Greenwald, and Kalemaris about the amended EEOC Charge.

54.   Also in November 2007, Plaintiff informed Farmingdale State Vice President Kevin Rooney ("Rooney") about the discrimination, sexual harassment, and retaliation through a document which described the contents of Plaintiff's EEOC Charge.

55.   In January 2008, Keen asked Rooney to investigate Plaintiff's allegations. Acting at the direction of Keen, Rooney interviewed some, but not all, members of the CAFPC committee as well as individuals who were not even on the CAFPC committee and/or who had relevant knowledge. Notably, Rooney did not interview Greenwald. During the interview process, Rooney informed his interviewees that Plaintiff had filed with the EEOC. The results of the Rooney investigation were then used to defend Farmingdale State against Plaintiff's EEOC Charges.

56.   In April 2008, Plaintiff was nominated by his supervisor for the Farmingdale Foundation Teaching Award, a prestigious award which would pay Plaintiff additional money (besides his salary) and/or enhance his chances at promotion. Plaintiff was rejected for the award. Keen and Greenwald were among the decision-makers regarding who receives the award.

57.   In or about August 2008, Plaintiff sought a promotion from President Keen (through the administrative channel process). Keen again denied the promotion.

58.   In September 2008, Plaintiff wrote to Keen to ask why Plaintiff had not been promoted.

14

59.   In October 2008, Plaintiff asked Provost Beverly Kahn (who is charged with making recommendations from that committee to the President) why Plaintiff was not promoted and why the CAFPC had placed him last on the list, but she was unable to provide specific reasons for those actions by the CAFC.   Kahn referred Plaintiff to Keen but Keen refused to speak with Plaintiff.

60.   At a meeting in October 2008, Kalemaris told faculty members, including Dan Hood ("Hood"), a member of the Unit Committee on promotions, that they should be very careful because "outside lawyers have been asking questions" about the promotion procedures.

61.   In November 2008, Kalemaris told Hood that Hood's positive recommendation of Plaintiff was "too strong" and that he "had better water it down for the next time."

62.   In addition, since at least 2005, he has been denied significant discretionary raises, which are awarded by the Farmingdale State's President.  However, Plaintiff's similarly-situated co-workers who had not rejected supervisors' romantic advances and had not complained of discrimination received said raises.

63.   In or about September 2008, Plaintiff applied for a promotion.

64.    In December 2008, the Unit Committee sent a strong letter to CAFPC, supporting Plaintiff's promotion. Plaintiff's supervisor, John Kostanoski, has supported Plaintiff, in writing, for promotion every time Plaintiff applied.

65.    In December 2008, Plaintiff was nominated by his supervisor for the Chancellor's Award for Excellence in Teaching. This award is a prestigious award which would pay Plaintiff additional money (besides his salary) and/or enhance his chances at promotion. Plaintiff was rejected for the award. Keen and Greenwald are among the decision-makers regarding who receives the award.

66.    At present, the chairperson of CAFPC is Agnes Kalemaris, who is a friend of Greenwald. In previous promotion cycles, Keen has instructed Kalemaris how to rank the candidates.

67.    When Plaintiff's application was physically sent to CAFPC, Kalemaris saw only the cover of Plaintiff's application in a pile of applications and immediately stated to Matt Bahamonde from the unit committee, "I'm not impressed with this candidate AT ALL."

68.    In February or March 2009, Kalemaris sent Plaintiff a letter stating that he had errors in his application, so he was not being considered for promotion by CAFPC, of which Issapour and Capella were also members. However, the first two levels of the promotion process, the Department and Unit Committees, reported no such formatting concerns. Kalemaris sent this letter to Kostanoski via direct interoffice mail. She sent a copy of the

16

letter to Plaintiff via United States mail with only, "Tino-Posillico, Whitman Hall" on the

envelope (no address), causing Plaintiff to receive the letter three months later.

69.     Kalemaris informed other faculty applicants Henry Bojack, Mary Villani, Eugenio

Villarreal, Al Short, and Donna Proper, none of whom rejected a supervisor's romantic

advances or complained of discrimination, of formatting errors with their promotion

applications.    These candidates were also advised by Kalermaris and their Unit

Committees on how to correct the errors in their applications, allowing them to go

forward with their promotion process.  Plaintiff, in contrast, received no such feedback or

guidance concerning his promotion application.

70.     Around the same time, Plaintiff learned that all of the other promotion candidates were

permitted to correct errors beyond the submission deadline.

71.     On or about April 2009, Plaintiff called Kalemaris to ask about his promotion denial and

she stated in angry manner, "You made errors." She also asked Plaintiff, "What is your

highest degree?" and when he responded that he had a PhD, she stated, "You have a PhD

and you can't follow directions."  She also stated that he had left dates out, despite that

the absence of those dates had not been an issue in the previous application nor when the

Plaintiff had met with Kalemaris in September 2008 to discuss any possible errors in his

current application.  In addition, she stated, when he asked, that what other candidates

had done was irrelevant.  Finally, Kalemaris stated that she was not going to waste any

more time discussing the matter.   When Plaintiff inquired about an appeal procedure, Kalemaris stated that she did not know and she abruptly hung up the phone.

72.   In June 2009, Plaintiff arrived at his office and discovered that the word "ass" above his name on the door and the garbage had been dumped on the floor of his office, which was located in a building that Greenwald managed. Plaintiff emailed Keen and Kahn and they each promised to investigate, but they did not do so.

73.   On August 24, 2009, Plaintiff wrote to Keen, with a carbon copy to SUNY Vice Chancellor and Chair of the SUNY Board of Trustees John Jay O'Connor, regarding the repeated denial of Plaintiff's promotion and referencing the continuing adverse effects of his previous harassment and retaliation, especially in regard to the Plaintiff's last application.

74.   On August 31, 2009, Keen wrote back, refusing to intervene on behalf of Plaintiff or take any further action.

75.   Plaintiff responded to Keen's refusal to act in a letter dated September 15, 2009.

76.   In August or September 2009, Plaintiff's supervisor, John Kostanoski, personally expressed concern to Keen about the repeated denials of the Plaintiff's promotion.   Keen never acknowledged the question and changed the subject to unrelated topics.

77.   Plaintiff applied for another promotion in September 2009.   The Departmental Committee reviewed Plaintiff's application, recommended promotion, and forwarded it to the Unit Committee.

78.   On or about September 20, 2009, Plaintiff encountered Kalemaris in person, but she stated that she did not have time to speak with him.

79.   On September 30, 2009, Kalemaris scheduled a seminar on guidelines for applications, cancelled it, and then held the seminar anyway without informing Plaintiff, despite his expressed interest.   Nonetheless, Plaintiff heard, through other candidates, that the seminar was happening and attended.   Kalemaris gave a vague seminar and informed attendees, while looking at Plaintiff, that the font size for applications was changed, so Plaintiff would have to rewrite his entire application.

80.   In October 2009, Plaintiff met with Kalemaris and Hood, the head of the departmental committee, regarding Plaintiff's promotion. Kalemaris was very vague in describing how Plaintiff could improve his application for promotion.   Instead, she claimed that Plaintiff had a precedent of problems going back a long time and stated, "I hope you get this right."

81.   In November 2009, Kostanoski told Plaintiff that Plaintiff had been reviewed by the wrong Unit Committee since 2005.   Plaintiff had been placed in the wrong Unit Committee by Keen's administration.   Although Kalemaris could have corrected this

19

error as early as 2005, she did not. Now Plaintiff must reintroduce himself and his qualifications to an entirely new Unit Committee and its members in the middle of the current promotion procedure.

82. Between May 2009 and December 2009, Plaintiff has complained to O'Connor, SUNY General Counsel Nicholas Rostow, and SUNY Appeals Officer Rose Scodanus of the discrimination, sexual harassment, and/or retaliation and the denials of promotion. Plaintiff asked each of those individuals for the procedures for obtaining a promotion, but none of them responded to him.

83. Also between May 2009 and December 2009, Plaintiff also made several FOIL requests to Rooney regarding the promotions, but Rooney did not provide the requested information.

## FIRST CAUSE OF ACTION
(42 U.S.C. § 1983)

84.   The Individual Defendants, while acting under color of state law, deprived Plaintiff of his constitutional rights, as secured by the United States Constitution, as enforced by 42 U.S.C. § 1983.

85.   In the ways described above, the Individual Defendants: (1) participated in violation(s) of Plaintiff's rights under the United States Constitution and/or (2) after being informed of violation(s) failed to remedy the violation(s) and/or (3) created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue and/or (4) were grossly negligent in supervising subordinates who committed the wrongful acts and/or (5) exhibited deliberate indifference by failing to act on information indicating that unconstitutional acts were occurring.

## SECOND CAUSE OF ACTION
(NEW YORK EXECUTIVE LAW § 296(6))

86.   Defendants Issapour, Keen, Capella, Eichler, Greenwald, Rooney, and Kalemaris (collectively, "Individual Defendants") aided, abetted, incited, compelled and/or coerced the aforementioned unlawful conduct of Farmingdale State, in violation of New York State Executive Law § 296(6), as an aider and abettor, in the form of discrimination based on sex/gender, sexual harassment, and retaliation based on complaints of discrimination.

21

## THIRD CAUSE OF ACTION
(Breach of Contract)

87.     Plaintiff and Defendants Eichler and Greenwald, as well as Farmingdale State, entered into a settlement agreement on or about April 7, 2005.


88.     Plaintiff has complied with all terms of the settlement agreement.


89.      However, Eichler and Greenwald each breached the settlement agreement.  Specifically, Eichler and Greenwald engaged in the following breaches: (1) Greenwald participated in deliberations of the campus-wide CCTA on whether Plaintiff should be granted tenure and employment by Farmingdale; and (2) Greenwald and/or Eichler and/or Keen (acting on behalf of Farmingdale State) permitted documents written by Eichler or Greenwald between September 1, 2003 and April 7, 2005 to remain in Plaintiff's personnel file and (3) Greenwald and/or Eichler influenced members of the CAFPC to decide against Plaintiff.


90.     As a result of the aforementioned breaches, Plaintiff has been damaged.

WHEREFORE, Plaintiff demands judgment against all Defendants in the form of and/or for compensatory, emotional, physical, and punitive damages (where applicable), lost pay, front pay, interest, injunctive relief, and any other damages permitted by law.  Plaintiff also demands judgment against defendants for each cause of action and for all applicable and permissible damages, in an amount to be assessed at the time of trial. The plaintiff further seeks injunctive relief, including but not limited to, the clearing of his personnel file of any wrongful disciplinary actions and a permanent injunction enjoining all Defendants and their agents from any further actions abridging Plaintiff's rights. Plaintiff further demands all attorneys' fees, disbursements and other costs and all further relief, equitable or otherwise, to which Plaintiff is entitled and/or which the Court deems just and proper.   Plaintiff demands a trial by jury.


Dated: Carle Place, New York
     January 8, 2010

                                        LEEDS MORELLI & BROWN, P.C.
                                        *Attorneys for Plaintiff*
                                        One Old Country Road, Suite 347
                                        Carle Place, New York 11514
                                        (516) 873-9550

                                        MATTHEW S. PORGES (MP-5826)